STATE BOARD OF TAX APPEALS.

Appeal of 1935—One Parcel.

CITY OF JERSEY CITY, PETITIONER, v. SEABOARD TERMINAL AND REFRIGERATION COMPANY, RESPONDENT.

Appeal of 1936—Two Parcels.

CITY OF JERSEY CITY, PETITIONER, v. SEABOARD TERMINAL AND REFRIGERATION COMPANY, RESPONDENT.

Appeals of 1937, 1938 and 1939—Three Parcels.

CITY OF JERSEY CITY, PETITIONER, v. SEABOARD TERMINAL AND REFRIGERATION COMPANY, RESPONDENT.

Decided January 21, 1941.

For the petitioner, *James A. Hamill* (by *Frank P. McCarthy*).

For the respondent, *Hobart, Minard & Cooper* (by *Duane E. Minard* and *Charles V. Webb, Jr.*).

QUINN, President. These appeals are taken by the petitioner taxing district from reductions made by the Hudson County Board of Taxation in the assessed valuations of certain structures, hereinafter described in detail, owned by the respondent. There are three buildings involved, as follows:

*Combination Storage Warehouse and Freight Station,* assessed as Block 361, Lot M 1.

*Ice Plant,* assessed as Block 395 A, Lot B2AM.

*Auction Building,* assessed as Block 362, Lot A 1.

The assessments and county board reductions, in respect of these buildings, for the years here in issue, are as follows:

| Year | | Warehouse | Ice Plant | Auction Bldg. |
|------|------------|-----------|-----------|---------------|
| 1935 | Assessment | $1,250,800 | . . . . . | . . . . . . . |
|      | County Board | 1,125,800 | . . . | . . . |
| 1936 | Assessment | 1,250,800 | $132,500 | . . . . |
|      | County Board | 1,125,800 | 119,500 | . . |
| 1937 | Assessment | 1,250,800 | 132,500 | $38,800 |
|      | County Board | 1,125,800 | 113,500 | 37,000 |
| 1938 | Assessment | 1,250,800 | 132,500 | 38,800 |
|      | County Board | 1,125,800 | 113,500 | 37,000 |
| 1939 | Assessment | 1,250,800 | 132,500 | 38,800 |
|      | County Board | 1,125,800 | 113,500 | 37,000 |

These buildings were constructed by respondent in 1927 for the unitary purpose of providing a complete means of handling the receipt, cold storage, and auctioning of the great volume of fruit and vegetables theretofore serviced at the Duane street piers in New York City. This purpose aborted because of the inability of respondent to effectuate the transfer of the market from New York to Jersey City, as originally contemplated, but the buildings are all nevertheless profitably used or rented by respondent. While it is undoubtedly true, as urged by counsel for respondent, that the failure of consummation of the original design for integrated use of these structures has greatly lessened the value which they would otherwise have had, that consideration, of itself, does not aid in the determination of their true value as of the several assessing dates, in the absence of proof as to what the value would have been, had the promoter's original plans availed, and as to the degree of diminution in such value attendant upon their disappointment. We must therefore consider solely the evidence adduced bearing upon the true value of the buildings, as actually constituted and used, and determine whether it justifies the several reductions allowed by the county board, in the light of the general knowledge and experience of the board, and of an inspection which we have made of the property.

Since the valuation of improvements only is in issue, our proper inquiry is the extent to which the presence of the improvement on the plot of land has increased the selling or market value of the entire parcel over that of the land, were it vacant. *City of Jersey City* v. *Harborside Warehouse Co., Inc. (State Board)*, filed simultaneously herewith.

The warehouse building is a ten-story structure measuring 400 by 200 feet, and 127 feet in height. It is erected on land leased by respondent from the Erie Railroad Company for a term of thirty years from July 31st, 1936, the building and fixtures to revert to the lessor at its expiration. The six upper stories constitute a modern cold storage warehouse, cork insulated, while the lower four stories are designed to serve as a railroad freight house. While there is a considerable amount of floor space in these stories which is rented for dry storage

and as business headquarters for grocery and dairy firms, the main purpose of the lower portion of the building is that of a freight terminus. The first and third floors each contain five railroad tracks of fifty car capacity, extending through the center for the entire length of the building, and much of the space on the second, third and fourth floors is taken up by steel bridge trusses supporting the track floors, and for headroom for the tracks. The Erie Railroad occupies the first four stories as a tenant of respondent at an annual rental of $196,628.24, but the proof is to the effect that the dry storage space on these floors is retained by respondent and rented by it to the business firms mentioned above, contrary to the assertion in briefs of counsel for respondent that the latter exercises no control or possession in this part of the building whatever.

The upper six floors are of reinforced concrete construction and tile inside walls, while the exterior of the entire building is of brick.

The testimony adduced by the parties bearing upon the valuation of this building is diversified in approach, but none of it purports to be directed toward the operative factor as to the extent to which the structure has enhanced the true value of the land. We have been able to arrive at certain conclusions in this regard, however, from the proofs offered. The books of the respondent show that the building and its fixtures have been carried at figures varying from $2,991,451.59 in 1935 to $2,688,932.64 in 1938, as compared with the assessed value of $1,250,800. Since our courts have considered book value as a persuasive factor in determining statutory true value (*Second National Bank and Trust Company of Red Bank* v. *State Board of Tax Appeals,* 114 *N. J. L.* 573; 178 *Atl. Rep.* 96; *General Motors Corp.* v. *State Board of Tax Appeals* (*Supreme Court,* 1940), 124 *N. J. L.* 212; 11 *Atl. Rep.* (2d) 314), this evidence weighs in favor of the taxing district's contention to the effect that the original assessment was not excessive, and this particularly in view of the absence of direct and reliable proof of the selling value of the building. See, *infra,* as to the nature of respondent's attempt at proof of this character.

Petitioner's proofs were primarily based upon depreciated replacement cost of the building, both from the standpoint of cubic foot units and of detailed quantity survey. While proof of this character, dissociated from the selling value of the property, is ordinarily of low probative value (*Central Railroad Co.* v. *State Board* (*Supreme Court,* 1886), 49 *N. J. L.* 1; 7 *Atl. Rep.* 306; *Turnley* v. *Elizabeth* (*Supreme Court,* 1908), 76 *N. J. L.* 42; 68 *Atl. Rep.* 1094; *Schelly* v. *City of Jersey City* (*State Board,* 1940), 18 *N. J. Mis. R.* 37; 11 *Atl. Rep.* (*2d*) 18), yet where structures of unique character, not usually sold in the real estate market, are involved, as here, resort to consideration of the physical constituents of the building and their cost may be justified. *Ranck* v. *City of Cedar Rapids,* 134 *Ia.* 563; 111 *N. W. Rep.* 1027. Conclusions thus arrived at are to be qualified, however, by such evidence as is available as to whether a prudent operator would make the expenditure as of the assessing dates. Petitioner's witnesses arrive at reproduction costs varying between $2,540,000 in 1935 to $3,251,200 in 1939, and at depreciated "sound values" of from $2,159,000 to $2,568,400. The figures as to replacement cost may be compared with an estimate by one of respondent's witnesses, a construction engineer specializing in refrigerator warehouses, of $1,900,000, as the replacement cost of the upper six stories of the building only. The lease between Erie Railroad Company and respondent called for the construction by the tenant of an *eight-story* warehouse, to cost approximately $3,500,000. In view of the case as an entirety, we have given some weight to petitioner's proofs as to depreciated cost, but have also taken into account the testimony offered on behalf of respondent that the investment in the building was not economically justified during the tax period here under consideration, because of the failure of the originally contemplated purpose of the enterprise.

The witnesses who testified on behalf of respondent were adduced in an attempt to establish that the assessment on the storage warehouse was in excess of the value reflected by the earning capacity of the enterprise. Evidence of this character can be received and considered only with extreme caution

since such earnings are subject to the factor of effectiveness and wisdom of management, and do not partake of the stability and reliability of net income produced by ordinary income producing property, such as stores, dwellings, &c. We stated in the *Harborside Warehouse Co., Inc., Case, supra,* and we here repeat that the capitalized earnings of a business, as distinguished from the normal rental yield of real estate, measure what the business enterprise is worth, and not what the realty housing the business is worth, although, in some circumstances, the one may throw some light on the other. This, from the proof adduced, is not such a case. Mr. Browning, an officer of the respondent, prepared and counsel introduced in evidence a schedule of the financial operations of the company, for the purpose of showing its net profits and losses during the assessment period. Included as items of deduction were figures of $97,490.49, $238,050.58 and $36,305.74, for the years 1936, 1937 and 1938, respectively, representing losses on loans made by the company to its storage customers against the security of commodities stored. In 1932 losses of this character aggregated $2,402,372.38. Whether or not such a practice, known as factoring, is common in the storage warehouse industry, the incidence of losses of this type reflects the highly speculative nature of the particular business enterprise with which we are here concerned, and dissipates any usefulness which a statement of financial operations might have in shedding light upon the true or market value of the structure in which the business is housed. These observations are not to be taken as an endorsement of the propriety of all of the other deductions shown by the statement as taken against gross receipts, but further comment in that connection is deemed unnecessary.

The testimony of respondent's witnesses tends, in certain aspects, to support, rather than to militate against the validity of the assessment on the warehouse. Mr. Green, a consulting refrigeration engineer of wide experience, arrived at a sound value of $904,000 for the *upper six stories only* of the building after estimating the replacement cost, as of October 1st, 1934, at $1,923,840. He regarded the lower four stories, however, as of no value whatsoever, in complete disregard of the

fact that these stories produced a rental of some $196,000 annually, from the Erie Railroad, and miscellaneous other revenue from other tenants, as seen hereinabove. Taking the value of the lower four stories into consideration, upon any reasonable capitalization of its rental yield, there would result an increase over Mr. Green's valuation of the upper six stories, far in excess of the assessment.

Another of respondent's witnesses, Mr. Kennedy, who has bought and sold cold storage warehouses throughout the East, arrived at a selling value of from fifteen to eighteen cents per cubic foot, for the property. Applying the measurements of the building made by petitioner's witness, Mr. Robertson, who found a cubic content of 10,160,000 cubic feet, there would result a selling value of $1,518,000 for the building, taking the minimum of fifteen cents per cubic foot, as compared with the assessment of $1,250,800.

The estimates of market value made by respondent's other witness, Mr. Weise, must be accorded little weight because he ascribed as a factor, the existence of the limited leasehold interest of respondent in the property and the reversionary interest of the Erie Railroad Company in the building. This factor was undoubtedly of considerable weight, since the leasehold will expire in 1956. The approach of the witness is directed toward the valuation of the leasehold to the business tenanting the building, whereas taxing districts are entitled to assess the structures at true and full value to a fee owner, and in the amount for which the property could be sold by fair sale, unfettered by leases or other restrictions created by private contract. *City of Jersey City* v. *Harborside Warehouse Co., Inc., supra.*

For all of the reasons hereinabove stated, we are of the opinion that the original assessment of $1,250,800 was not in excess of the true value of the storage warehouse for any of the years in question and that the judgments of the Hudson County Board of Taxation reducing the assessments should be reversed, and the said original assessments restored.

We have examined the proofs with respect to the ice house and the auction building and conclude therefrom that the original assessments upon these structures, in the sums,

respectively, of $132,500 and $38,800, should likewise be restored for each of the tax years involved herein. The ice house is essential to the operation of the refrigerated section of the storage warehouse, supplying its essential need for refrigeration machinery and in addition has produced ice for public consumption to the extent of sales of approximately $160,000 per year. The auction building is rented to the Erie Railroad Company at a rental of $25,000 per year.

Judgments in accordance with the foregoing conclusions.